The HIGHLANDS HOMES
ASSOCIATION, et al.,
Appellants,

v.

The BOARD OF ADJUSTMENT,
et al., Respondents.

No. WD 70862.

Missouri Court of Appeals,
Western District.

Dec. 22, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 2, 2010.

Application for Transfer Denied April 20, 2010.

---

1. All statutory references are to RSMo.2000, unless otherwise indicated.

Thomas M. Schneider, Columbia, MO, for Appellant.

Kathleen D. Pitzer, Columbia, MO, for Respondents, Sprint Spectrum, L.P., E. Stanley Kroenke, William James, Jr., Dennis Harper and Sterling Kelly d/b/a Highland Properties Co.

Susan G. Crigler, Columbia, MO, for Respondent, Board of Adjustment of the City of Columbia, Missouri.

Before Division III: KAREN KING MITCHELL, Presiding Judge, and JAMES E. WELSH and MARK D. PFEIFFER, Judges.

KAREN KING MITCHELL, Presiding Judge.

This is an appeal from an administrative decision of the Columbia Board of Adjustment ("Board") granting two zoning variances in favor of Highland Properties Co. ("Landowner") and Sprint Spectrum, L.P. ("Sprint") for development of a disguised cellular support structure and accompanying equipment storage facility. We affirm the Board's decision.

### Factual and Procedural Background

Landowner entered into a lease agreement with Sprint, allowing Sprint to construct a ninety-five-foot mono-pole cellular tower on a now-vacant lot. The tower, more accurately called a "disguised support structure," would be designed to look like a flagpole, but without the flag. It would not be lighted and would be painted a matte grey color. The lease also allowed for an equipment shelter for aboveground storage ancillary to the tower. The structure would be landscaped and hidden be-

hind a masonry wall. Verizon Wireless would also use the tower once constructed.

The property at issue is zoned C–1, which is a commercial zoning designation for an "intermediate business district." Pursuant to Section 29–21.3(c)(4) of the City of Columbia Ordinances, the construction of a disguised support structure is a permitted use in a C–1 zoning district, "provided that all related equipment shall be placed underground or concealed within the structure." A variance would, therefore, be needed to place the equipment shelter aboveground. Landowner and Sprint requested such a variance from the Board.

Columbia's ordinances also limit the height of any building or tower located in a C–1 zoning district to a maximum of thirty-five feet, while allowing another six feet for an antenna, for a maximum total height of forty-one feet. §§ 29–14(d)(3) & 29–26. Initially, Landowner and Sprint took the position before the Board that because disguised support structures were not buildings or towers, they were not subject to the height requirements and did not need a variance for the construction of the ninety-five-foot pole. The Board decided that, because the disguised support structure served basically the same purpose as a tower, it was subject to the height restriction. Accordingly, Landowner and Sprint sought a second variance for the height of the pole.

The Board held a hearing on the variance issue. Evidence was presented to the effect that Sprint had a significant area where the cellular phone service it was able to provide to its customers was less than what was acceptable. Some areas had very poor coverage and some areas had no coverage. Sprint also presented evidence that an increasing number of customers were forgoing land lines in favor of cellular telephone service and that over

half of the 911 calls made in Columbia in recent years had been made from cellular phones. A Sprint project manager testified that Sprint had looked for several years for a location for a cellular tower. No existing towers were acceptable to Sprint because they were either too far from the low-coverage area or were otherwise not acceptable for joint use with Verizon Wireless. Sprint had also approached several other landowners about constructing a tower in other locations but could not find an acceptable site where the landowner would agree to lease its land for the construction of a cellular tower. The only acceptable site willing to lease to Sprint was the site at issue.

The proposed site is located across the street from the Highlands subdivision. The Highlands is an area of fairly upscale homes. Several of the homeowners testified at the hearing that they did not want the cellular tower in the proposed location because it would be visible from many of their homes, and they were afraid it would cause their property values to fall. Landowner presented a local real estate appraiser who testified that he had researched the issue and that several other upscale neighborhoods were located near and within sight of cellular towers and that the towers seemed to have no effect on property values. On the contrary, he believed that many other of the approved C–1 uses for the property, including apartments, daycare centers, restaurants, and retail centers, would create more traffic, noise, and visual pollution than would the cellular tower and would "have a greater potential to impact on the value of the property in that neighborhood than the proposed tower."

In discussing the variance needed to place the equipment shelter aboveground, one Board member noted that "time and again, we have been shown that it just

doesn't work to put everything underground." Another Board member stated that he had had several meetings on the matter with other City officials and that they had found that it was not technically feasible to put all of the equipment needed for a cellular tower underground as the ordinance required. There was discussion about the need to update the ordinances, and the Board agreed to grant the two requested variances. The Highlands Homes Association and individual homeowners (collectively "Association") appeal the Board's decision.

## Standard of Review

■ We review the decision of the Board, not the decision of the trial court. *State ex rel. Teefey v. Bd. of Zoning Adjustment*, 24 S.W.3d 681, 684 (Mo. banc 2000). We review many zoning board decisions to determine whether they are supported by competent and substantial evidence on the record as a whole, or whether they are arbitrary and capricious, unreasonable, unlawful, or in excess of the Board's jurisdiction. *Id.* This is the standard of review the Association urges us to use. A zoning board's grant of non-use variances such as the ones at issue in this case, however, are reviewed for abuse of discretion. *State ex rel. Branum v. Bd. of Zoning Adjustment*, 85 S.W.3d 35, 39 (Mo. App. W.D.2002).

■ There are two main types of variances a board may be asked to grant. Use variances allow a landowner to use a particular property in a manner that is not permitted under applicable zoning ordinances. *See Matthew v. Smith*, 707 S.W.2d 411, 413 (Mo. banc 1986). Non-use variances allow the landowner to use the property in a manner approved by the ordinance but allow the landowner to deviate from a restriction related to the permitted use. *Id.* Non-use variances usually concern restrictions as to height of a structure, bulk of a structure, or setback from a property line. *Id.* In this case, a disguised cellular support structure is a permitted use for property zoned C–1, so the requested variance is a non-use variance. An applicant for a use variance must prove that it faces an "unnecessary hardship," whereas an applicant for a non-use variance must show that it faces "practical difficulties." *Baumer v. City of Jennings*, 247 S.W.3d 105, 113 (Mo.App. E.D.2008). The non-use variance applicant's burden is, therefore, *"slightly* less rigorous" than that of the use-variance applicant. *Id.* (emphasis in original). "The determination of whether practical difficulties exist is a factual matter," which is why the abuse of discretion standard is used. *Id.*

## Legal Analysis

The Association's first two points on appeal are that there is a lack of substantial evidence in the record supporting the Board's grant of the non-use variances for the construction of the cellular tower and the equipment structure. Because the Association does not apply the correct standard of review, we will interpret their points as asserting that the Board abused its discretion in granting the variances. *See Branum*, 85 S.W.3d at 39.

### A. Height Variance

■ We will first review the grant of the variance as to the height of the disguised support structure. The Board granted the variance, apparently finding Sprint and Landowner proved practical difficulties that warranted the variance. The Association argues that Landowner "failed to offer any evidence to establish the elements of a variance," citing *Branum. Branum*, however, does not set forth "elements of a variance," a fact that the Association's counsel acknowledged of his own accord at argument. Rather, *Bra-*

*num* notes that there is no precise definition for "practical difficulties" when it comes to a board's determination of whether a variance should be granted. *Id.* at 40. It goes on to quote *Slate v. Boone County Board of Adjustment,* 810 S.W.2d 361, 364 (Mo.App. W.D.1991), " '[a]t the very least, a non-use variance applicant must show that as a practical matter the property cannot be used for *a permitted use* without coming into conflict with certain of the ordinance's restrictions.' " *Id.* (emphasis added).

The Association seems to interpret this to mean that before a variance could be granted, Landowner must show that the land cannot be used for *any* permitted use without coming into conflict with the ordinance's restrictions. This is not our reading of the law. Clearly, a disguised cellular support structure is *a permitted use* in property zoned C–1. Sprint and Landowner also presented evidence at the hearing that a forty-one-foot tower would not be sufficient to provide adequate service to Sprint's customers and that a minimum height of ninety-five feet would be required. Sprint and Landowner also provided several maps showing optimal cellular coverage as it is currently, what it would be with a thirty-five-foot tower, with a forty-one-foot tower, and with a ninety-five-foot tower. Thus, Landowner and Sprint sufficiently proved that they could not use the land for a disguised cellular support structure, a permitted C–1 use, without coming into conflict with the height restrictions found in the ordinance.

*Branum* lists several additional factors for a board to consider when determining whether "practical difficulties" exist, and these are what the Association calls "elements of a variance." These factors include: (1) how substantial the requested variance is; (2) whether the variance will result in a substantial change to the character of the neighborhood or create a substantial detriment to adjoining properties; (3) whether the difficulty can be obviated by some method, feasible for the applicant to pursue, other than a variance; and (4) whether, in light of the manner in which the difficulty arose and considering all relevant factors, the interests of justice will be served by granting the variance. *Id.* at 41. We will briefly address each of these factors.

Association points out that the requested height variance is more than twice the current height restriction set forth in the ordinance. While this is true, and certainly a ninety-five-foot-tall *building* would be difficult to justify in a C–1 area under any circumstance, the cellular tower is quite narrow, being designed to resemble a flagpole, and so it is far less obtrusive than its height alone would indicate.

The Association argues that the second factor also weighs in its favor. Several neighbors testified at the hearing that they were afraid their property values would decrease if the variance were granted. However, there was ample evidence presented at the hearing that several other comparable subdivisions in Columbia were within sight of cellular towers, some much higher than the one proposed by Sprint and Landowner. Also, a local real estate appraiser testified that not only did he not believe that cellular towers reduced neighboring property values but that other approved uses for the C–1–zoned property would have a much greater negative impact on the enjoyment and value of the neighboring homes than would the tower.

Association argues that the third factor favors it, because Landowner could have requested a change in the zoning of the property rather than request a variance. This is true. However, a landowner could always request a change in the zoning of a particular property; so if this were the

criterion, a variance would never be justified. Moreover, the Landowner and Sprint presented evidence that Sprint could not construct a workable cellular tower at the approved forty-one-foot height and that it had searched for several years without success to find a suitable substitute location. We find that a variance is the best cure for the would-be violation in this case.

We find that the fourth factor also favors the Board's grant of the variance. The Board considered that cellular phone usage in Columbia was ever-increasing; that the area near the proposed tower had a gap in reliable service; that not only Sprint, but also Verizon was planning to use the proposed tower to provide cellular service to Columbia customers; that the requested variance was the least amount needed to provide adequate service to nearby properties; that the tower was not predicted to impact the value of neighboring homes negatively; and that the proposed tower would not present a health risk to nearby residents. While the Board did consider the testimony of the neighbors who attended the hearing, it unanimously voted to approve the variance, finding practical difficulties existed warranting the variance. The Board did not abuse its discretion with its determination.

Finally, in addition to the four factors set forth in *Branum*, Association contends that variances may only be granted for reasons related to the property and not due to personal hardship of the owners. Specifically, Association claims that variances should be limited to situations where the topography of the land makes compliance with ordinance requirements impractical. Association clearly gets this "element of a variance" from *Branum* as well. *Id.* at 40–41. However, a careful reading of *Branum* and the cases it cites does not lead us to conclude that a topographical challenge is required for the proper granting of a variance in every instance.

In several of the cases cited by *Branum*, the city ordinance at issue setting forth when a variance may be granted required such a topographical limitation.[1] Association cites no such limitation in the applicable Columbia ordinances. Another instance where *Branum* and the authority it cites require a land-specific challenge is when "economic hardship" is a primary consideration. *Id.* at 41. *See also State ex rel. Holly Inv. Co. v. Bd. of Zoning Adjustment*, 771 S.W.2d 949, 951–52 (Mo. App. W.D.1989). This occurs when an ordinance is violated and an applicant later seeks a variance to prevent great economic hardship in bringing its property into compliance with the ordinance. *Branum*, 85 S.W.3d at 41. Imposing the additional requirement of establishing a topographical limitation is justified when the Landowner created the "economic hardship" upon which he then seeks to rely to support a variance. Because Landowner and Sprint do not seek to rely on "economic hardship" as a primary consideration, we do not find that they were required to

---

1. *See, e.g., Hutchens v. St. Louis County,* 848 S.W.2d 616, 618 (Mo.App. E.D.1993) (ordinance allowing variance "where there are practical difficulties or unnecessary hardships in the carrying out of these provisions due to an irregular shape of the lot, topographical or other conditions"); *State ex rel. Klawuhn v. Bd. of Zoning Adjustment,* 952 S.W.2d 725, 728 (Mo.App. W.D.1997) (ordinance allowing consideration of a variance when "[t]he particular physical surroundings, shape or topographical condition of the specific property involved would result in an unnecessary hardship upon the owner as distinguished from a mere inconvenience"); *Wehrle v. Cassor,* 708 S.W.2d 788, 790 (Mo.App. E.D.1986) (ordinance allowing granting of a variance "when an irregular shape of the lot, topographic or other similar condition causes practical difficulties or unnecessary hardships").

show a topographical limitation to the particular piece of land in question to justify their request for a variance in this instance.

In sum, the Board considered all of the relevant factors set forth in *Branum* and determined that the height variance Landowner and Sprint requested was appropriate. We do not find that it abused its discretion in so doing.

## B. Equipment Structure Variance

■ Property zoned C–1 may have a disguised cellular support structure such as the one proposed, so long as any accompanying equipment is housed underground or concealed within the structure. Sprint and Landowner requested a variance to house the equipment in a separate aboveground support structure, which the Board also approved. The Association also argues that the Board erred in granting this variance. The Association's main argument as to this point is that Landowner presented no evidence other than its attorney's opening statement that the equipment could not be stored underground.[2] While this is true, the Board's proceedings are not bound by the strict rules of evidence that apply in courts. The Board may consider counsel's remarks. Also, the Board had before it a letter dated May 29, 2007, from counsel on behalf of Landowner's and Sprint's application for variance, which was requested to be considered part of the application, stated that the support equipment needed for the tower was "too large to be ` housed in the tower and [would] need to be accessible for maintenance, repair, replacement and other care such that being underground [was] not practical."

■ Furthermore, the Board's discussion at the end of the hearing makes evi-dent that it had considered this issue multiple times in the past:

MS. JOHN: As to the underground equipment shed, time and again, we have been shown that it just doesn't work to put everything underground.

MR. PANECK: John Sudduth, Building Regulations Supervisor, Henry Stoltz, City Counselor, and myself have had meetings over this issue. And I think it was Mr. Stoltz's position that it is nearly technically infeasible to place this equipment either underground or inside the structure.

MS. JOHN: Right.

MR. PANECK: And it has become the interpretation, though it is not necessarily in the ordinance, but it has become our interpretation that a disguised structure as a pole or a tree or whatever it may be, would include a disguised equipment shelter, so long as it was compatible with the adjoining architecture.

MS. JOHN: Okay. Okay. Is that something that we should request a revision?

MR. PANECK: Yes.

"A board may consider the hearsay testimony of city staff members received without objection." *Baumer v. City of Jennings*, 247 S.W.3d 105, 113 (Mo.App. E.D. 2008); *State ex rel. Sander v. Bd. of Adjustment*, 60 S.W.3d 14, 16 (Mo.App. E.D. 2001). We see no need to require variance applicants to re-invent the wheel if the Board and other City officials have already heard evidence on this issue in other cases.

The Association also argues that the Board has improperly effectively rewritten the ordinance by interpretation. While Mr. Paneck, in the above-cited transcript, used the word "interpretation," the Board did not merely interpret the existing ordinance to allow for an aboveground support

---

**2.** That the equipment cannot be concealed within the flagpole-like structure is not chal-lenged.

structure. The Landowner still applied for a variance on the matter, and the Board still granted the variance. The Board also noted that it should pursue revision of the ordinance in accordance with its findings for future development. We would remind the Board that so amending the ordinance might prevent similar litigation in the future, in case it is inclined to abandon such amendment. Repeated grants of variances on this issue could possibly constitute an abuse of the Board's discretion.[3] *See Wehrle v. Cassor,* 708 S.W.2d 788, 791 (Mo.App. E.D.1986) (holding that unlimited discretion to grant variances would constitute an unconstitutional delegation of legislative authority). Association has not alleged that the Board has repeatedly and improperly granted such variances, however, so as to constitute a de facto amendment of the ordinance. We do not find, therefore, that the Board abused its discretion in granting the variance for the aboveground support structure in this instance.

### C. Federal Telecommunications Act

For the Association's final point on appeal, it claims that the Board erred in approving the requested variances to the extent that it relied on the Federal Telecommunications Act, because it does not apply to the case at issue. The Federal Telecommunications Act, 47 U.S.C. § 332(c)(7) (1996), provides that when a local governing authority denies permission to construct a wireless facility, the denial must be supported by substantial evidence. The purpose of this law is to "promote competition and higher quality in telecommunications services and to encourage the rapid deployment of new telecommunications technologies." *Verizon Wireless (VAW), LLC v. Douglas County, Kansas, Bd. of County Comm'rs,* 544 F.Supp.2d 1218, 1241 (D.Kan.2008).

One of the Board members mentioned this provision during the discussion at the end of the hearing. As the Association notes in its own brief, however, "there is no reason to believe that the Board of Adjustment based its decision upon it." Indeed, the Telecommunications Act would have been applicable only if the Board had denied the applications for variance at issue in this case. It did not, and so we need not address this point further.

### Conclusion

For all of the above reasons, we find that the Board of Adjustment of the City of Columbia did not abuse its discretion in granting the requested variances to Highland Properties Co. and Sprint Spectrum, L.P., for the construction of the disguised cellular support structure and the accompanying equipment facility. We, therefore, affirm the decision of the Board.

JAMES E. WELSH, Judge, and MARK D. PFEIFFER, Judge, concur.

---

**3.** We say "could" because the court's own review of the zoning ordinances alerts us to Section 29–31(g)(6)c, which states:

> In passing upon appeals where there are practical difficulties or unnecessary hardship in the way of carrying out the strict letter of this chapter, [the Board shall have the power] to vary or modify the application of any of the regulations or provisions of such chapter relating to the construction or alteration of buildings, so that the spirit

of such chapter shall be observed, public safety and welfare secured, and substantial justice done.

Neither party addresses whether this provision could be used to allow the Board to routinely "interpret" the ordinances to allow support equipment structures aboveground without pursuing modification of the existing ordinances, and we need not decide the matter here.